UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 9:17-CIV-80522-MARRA/Matthewman

DIETMAR DUDE,

     Plaintiff,

     vs.

CONGRESS PLAZA, LLC; CONGRESS 1010, LLC;
S&J PROPERTY HOLDINGS, LLC; FENNARIO
INVESTMENTS, LLC; DAVID M. GOLDSTEIN, P.A.;
DAVID M. GOLDSTEIN; BARRY G. RODERMAN;
THOMAS R. FARESE; and SUZANNE FARESE,

     Defendants.

_____/

## **PLAINTIFF'S SECOND AMENDED COMPLAINT**

DIETMAR DUDE, Plaintiff, ("Plaintiff"), by and through the undersigned counsel, hereby files this Amended Complaint against the Defendants, CONGRESS PLAZA, LLC, a Florida Limited Liability Company ("Congress Plaza"); CONGRESS 1010, LLC, a Florida Limited Liability Company ("Congress 1010"); S&J PROPERTY HOLDINGS, LLC ("S&J"); DAVID M. GOLDSTEIN, P.A., a Florida Professional Corporation ("Goldstein Law"); DAVID M. GOLDSTEIN, an individual; BARRY G. RODERMAN, an individual; THOMAS R. FARESE, an individual; and SUZANNE FARESE, an individual, and alleges in support thereof:

## **STATEMENT OF JURISDICTION AND VENUE**

1.     The Plaintiff, at all material times, was over the age of 18, a citizen and resident of Germany, and is otherwise *sui juris*. At no time has Plaintiff been a citizen or legal permanent

resident of the United States or any of its territories.

  2. Congress Plaza is a limited liability company organized and existing under the laws of the State of Florida, with a principle place of business in Broward County, Florida.

  3. Congress 1010 is a limited liability company organized and existing under the laws of the State of Florida, with a principle place of business in Broward County, Florida.

  4. S&J is a limited liability company organized and existing under the laws of the State of Florida, with a principle place of business located in Palm Beach County, Florida.

  5. Goldstein Law is a professional corporation organized and existing under the laws of the State of Florida, with its principle place of business located in Miami-Dade County, Florida.

  6. David M. Goldstein is an individual who, to the best of Plaintiff's knowledge, is a resident of Miami-Dade County, Florida.

  7. Barry G. Roderman is an individual who, to the best of Plaintiff's knowledge, is a resident of Broward County, Florida.

  8. Thomas R. Farese is an individual who, to the best of Plaintiff's knowledge, is a resident of Palm Beach County, Florida.

  9. Suzanne Farese is an individual who, to the best of Plaintiff's knowledge, is a resident of Palm Beach County, Florida.

  10. This action was removed from state court by the Internal Revenue Service ("IRS"), which has been dismissed as a party to this case. However, Plaintiff and Defendants are of diverse citizenship, and this is an action for damages in excess of $75,000.00, exclusive of interest, costs, and attorney's fees; jurisdiction remains proper in this Court pursuant to 28 U.S.C. § 1332.

11.     Venue is proper in Palm Beach County by virtue of the Settlement Agreement's choice of venue clause, which provides that the "venue for any proceeding regarding this Agreement shall lie exclusively in Palm Beach County, Florida." (See **Exhibit 1, ¶** 18.) Thomas R. Farese executed the Agreement at issue in this matter on behalf of Congress Plaza and in his individual capacity. Congress 1010, S&J, Goldstein Law, David M. Goldstein, and Barry G. Roderman are not party to the contract at issue. However, both Congress 1010 and S&J have a principle place of business located in Palm Beach County. The property encumbered by the mortgage which Plaintiff seeks to foreclose is located in Palm Beach County, Florida. Venue is therefore also proper in the U.S. District Court for the Southern District of Florida pursuant to 28 U.S.C. § 1391 (b)(1) (2017) and 28 U.S.C. § 1391 (g) (2017), and in Palm Beach County under FLA. STAT. §§ 47.011, 47.021 (2016).

## STATEMENT OF FACTS

12.     Plaintiff formed Congress Management, LLC ("Congress Management") on or about February 17, 2006 and voluntarily dissolved the company on or about March 10, 2015. At all material times, Plaintiff was the sole member of Congress Management and served as the Managing Member from 2010 until dissolution of the company.

13.     Congress Plaza was initially organized as Riviera Yacht Marine, LLC on or about August 22, 2005. The company's name was changed to Congress Center, LLC in 2006, and eventually to Congress Plaza, LLC in 2006. From its formation to the present, Thomas R. Farese has been the manager of Congress Plaza in all of its iterations.

14.     Plaintiff's brother, Harald Dude, acted as agent for Plaintiff, and as registered agent for Congress Management from 2007 until the company was voluntarily dissolved. Harald Dude also acted as Manager of Congress Management from 2007 until 2010. At no material time

did Harald Dude hold a membership interest in Congress Management.

15.     On or about January 19, 2010, Congress Shopping Center, Ltd., a Florida Limited Partnership ("Congress Shopping Center"), executed a Promissory Note in favor of Congress Management in the amount of $2.33 million. The debt was secured by a mortgage against six parcels of land ("Six Parcels") located in Palm Beach County, Florida, which are identified by the following Parcel Control Numbers: (a) 00-43-43-29-05-000-0090; (b) 00-43-43-29-05-000-0150; (c) 00-43-43-29-05-000-0160; (d) 00-43-43-29-05-000-0190; (e) 00-43-43-29-05-000-0200; and (f) 00-43-43-29-05-000-0350. This mortgage was recorded in the Official Records of Palm Beach County on or about January 22, 2010. (The Note and Mortgage described in this Paragraph is hereafter referred to as the "Jeff George Mortgage." A copy is attached as **Composite/Exhibit 3-1.**)

16.     In the mid-2000's, disputes arose between Harald Dude, Thomas R. Farese, and The Palm Steak House, LLC (formerly known as Palm Beach Gentleman's Club, LLC) a Florida limited liability company that is not a party to this lawsuit, which resulted in the filing of two lawsuits in Palm Beach County, Florida bearing case numbers 50-2008-CA-012541 and 50-2009-CA-010990.

17.     Harald Dude and Thomas R. Farese, individually and as authorized agents, managers, or members of Congress Management (Dude), The Palm Steak House, LLC (Farese), and Congress Plaza (Farese), negotiated a settlement of the two lawsuits. The settlement was memorialized in the Settlement Agreement ("Agreement"), which was entered into on or about May 28, 2010. A copy is attached as **Exhibit 1.**

18.     Pursuant to the Agreement, Congress Plaza agreed to purchase the Jeff George Mortgage for $2.48 million, which was to be paid as follows:

a.    $20,000.00 down payment via check;

b.    $50,000.00 promissory note issued to Aldo Beltrano, to be paid at a rate of $1,000.00 per month, for fees owed to him by his clients: Harald Dude, Congress Management, and the Dude Family;

c.    $100,000.00 credit to Congress Plaza towards the purchase to cover attorney's fees it expected to incur to foreclose the Jeff George Mortgage;

d.    $2.41 million Promissory Note secured by a mortgage against the same Six Parcels which secured the Jeff George Mortgage. However, the $100,000.00 credit was immediately applied, and the actual face value of the Promissory Note was $2.31 million. (The partial payment may be hereinafter referred to as the "Congress Management" or "Plaintiff's Mortgage." True and correct copies of the Promissory Note and Mortgage executed in favor of Congress Management are attached as **Composite/Exhibit 2-1 and 2-2,** respectively).

19.    The Congress Management Note accrued interest at a rate of 6 percent per annum. Monthly payments on the Note were to be made as follows:

a.    $11,500.00 per month during the First Year. This is an interest only payment. (Paid by Congress Plaza)

b.    $14,000.00 per month during the Second Year. This is an interest only payment. (Paid by Congress Plaza)

c.    $16,500.00 per month at the beginning of the Third Year and for the remaining life of the Note, which was to balloon in May 2017. (Not paid per Agreement).

20.     Congress Management, in turn, assigned the Jeff George Mortgage to Congress Plaza, which did not record the Assignment in the Official Records of Palm Beach County. (A copy of the  unrecorded Assignment from Congress Management to Congress Plaza is attached as **Composite/Exhibit 3-2.**) Paragraph 2 of that Assignment provides that "*the outstanding principal balance of the loan is $2,330,00.00 plus interests, penalties, costs and fees on the date hereof.*" (Emphasis added.)

21.     On or about July 21, 2010, Congress Shopping Center executed a deed conveying the Six Parcels to Congress Plaza in fee simple absolute. The deed was recorded on or about October 5, 2010. By virtue of this deed, there was unity of title to the Six Parcels and the Jeff George Mortgage and the Congress Management Mortgage became a first lien against the Six Parcels.

22.     Congress Plaza made the contemplated, interest-only payments during the first two years of the Note term.

23.     On or about September 20, 2012, Congress Plaza delivered to Congress Management a check in the amount of $400,000.00. The check was written from Barry G. Roderman & Associates, P.A. IOTA Trust Account and signed by Barry G. Roderman. The check memorandum states that the money is for "Reduction Payment/Modification Note." A copy of the cancelled check is attached as **Composite/Exhibit 4-1.**

24.     This check was personally delivered to Harald Dude, the authorized representative of Congress Management, by David M. Goldstein sometime between September 20 and September 24, 2012.

25.     At that meeting or shortly thereafter, David M. Goldstein, on behalf of Congress Plaza, presented Harald Dude, as authorized agent of Congress Management, with a modification

agreement. Congress Plaza requested that Congress Management satisfy the Congress Management Mortgage as to the parcels ending in 0190, 0200, and 0350 and modify the terms of payment with regard to the remaining principal balance of the Promissory Note owed to Congress Management, in exchange for the $400,000.00 payment ("Requested Modification"). (A copy of the Requested Modification is attached as **Composite/Exhibit 4-2.**)

26.    <u>Congress Management refused to sign the Requested Modification.</u> The Requested Modification remains unsigned by Congress Management, Plaintiff, or Plaintiff's agent, Harald Dude.

27.    Congress Management did accept the $400,000.00 strictly as payment towards the principle of the debt. Further principle payments as contemplated by the Requested Modification were not made by Congress Plaza, and Congress Management did not consent to the Satisfaction of the Subject Note and Mortgage as to the parcels ending in 0190, 0200, and 0350. Regardless, the Requested Modification is considered a credit agreement and is unenforceable due to non-compliance with the Statute of Frauds. *See Vargas v. Deutshe Bank Nat'l Trust Co.,* 104 So. 3d 1156, 1168 (Fla. 3d DCA, 2013) (quoting FLA. STAT. § 687.0304(2), "a debtor may not maintain an action on a credit agreement unless the agreement is in writing, expresses consideration, sets forth the relevant terms and conditions, and *is signed by the creditor and the debtor*." (emphasis added)); *Id.* (citing *Fenn v. Litton Loan Servicing LP*, No. 6:10-cv-965-ORL-28DAB, 2010 WL 8318866, at *2 (M.D. Fla. Dec. 10, 2010), which "stat[ed] that a loan modification agreement is an agreement 'to lend money and extend credit' under section 687.0304.").

28.    Following the $400,000.00 principal payment, Congress Plaza ceased to make full payment of $16,500.00 as contemplated by the Note. Instead, it began to make partial payments, usually in the amount of $7,900.00, although larger sums were occasionally remitted.

29.     During the fall of 2012, Congress Plaza was in the process of selling three of the Six Parcels (those ending in 0190, 0200, and 0350), as well as an adult entertainment club located thereon, to S&J. When Congress Management refused to sign the Requested Modification releasing the three parcels to be sold, Congress Plaza needed a new plan to ensure S&J that they were receiving marketable title.

30.     Congress Plaza could have simply satisfied the Jeff George mortgage itself. Plaintiff alleges, however, that the members of Congress Plaza recognized the Jeff George Mortgage for what it was: a loose thread which, if pulled at, would unravel the whole fabric of the S&J closing. A satisfaction from Congress Plaza would have raised questions about why the company held a mortgage against property it owned, a line of inquiry that, if answered truthfully, inevitably leads to the revelation of the Settlement Agreement and Congress Management's mortgage. With Congress Management refusing to agree to a partial satisfaction of the unrecorded mortgage, this was a line of questioning that Congress Plaza desperately needed to avoid.

31.     On or about October 22, 2012, Barry G. Roderman, one of Congress Plaza's managing members and its current counsel, formed Congress 1010, LLC. Mr. Roderman has since acted as the manager and registered agent of Congress 1010.

32.     Congress 1010 was formed a mere week before the S&J transaction appears to have closed. Congress 1010 appears to serve little purpose other than to provide a buffer for Congress Plaza; a screenshot of the search results for "Congress 1010 LLC" in the public records of Palm Beach County, Florida is attached as **Exhibit 17**; all results appear to be directly or closely related to the S&J and Fennario transactions.

33.     In connection with the S&J transaction, Barry G. Roderman executed a

Satisfaction of the Jeff George Mortgage on behalf of Congress 1010 on December 5, 2012. At that time, Congress Plaza was still the holder of that mortgage. An Assignment of the Jeff George Mortgage from Congress Plaza to Congress 1010 was not executed until January 10, 2014, again by Barry G. Roderman--this time as managing member of Congress Plaza. Moreover, Paragraph 3 of the Assignment of the Jeff George Mortgage from Congress Plaza to Congress 1010 provides that Congress Plaza "represents, warrants, and covenants that (a) [Congress Plaza] owns the Loan Documents *free and clear of all liens and encumbrances*." (**Composite/Exhibit 3-2,** Assignment, ¶ 3) (emphasis added).

34.    Forming and using Congress 1010 to execute a Satisfaction of the Jeff George Mortgage relieved Congress Plaza from its role as mortgagee of the Jeff George Mortgage, and attenuated Congress Plaza's connection with Congress Management such that a casual observer might be far less inclined to pull at that loose thread.

35.    On or about October 29, 2012, Congress Plaza executed a deed purporting to convey the parcels ending in 0190, 0200, and 0350 to S&J; however, that deed was recorded only as to the parcels ending in 0190 and 0200. (Warranty Deeds attached as **Composite/Exhibit 5-1**.)

36.    As of October 29, 2012--the date the Warranty Deeds were signed--the Jeff George Mortgage was unsatisfied and outstanding. Congress 1010 executed a satisfaction of the Jeff George Mortgage as to all Six Parcels, which was recorded on or about December 6, 2012. (A copy of the Satisfaction is attached as **Composite/Exhibit 3-3.**) Barry G. Roderman, Congress 1010's manager and registered agent, executed the Satisfaction on behalf of Congress 1010. At this time, Mr. Roderman had personal and actual knowledge of the Settlement Agreement and of the existence and validity of the Congress Management Mortgage.

37.     Congress Plaza was still the holder of the Jeff George Mortgage on December 5, 2012.

38.     Congress Plaza did not execute an assignment of the Jeff George Mortgage to Congress 1010 until January 10, 2014, more than a year after Congress 1010 executed and recorded the Satisfaction. The assignment was recorded in the Official Records of Palm Beach County on or about January 14, 2014. (A copy of the Assignment is attached as **Composite/Exhibit 3-4.**)

39.     Barry G. Roderman, Congress Plaza's managing member and attorney, executed the Assignment on behalf of Congress Plaza. At this time, Mr. Roderman had personal and actual knowledge of the Settlement Agreement and of the existence and validity of the Congress Management Mortgage.

40.     Goldstein Law acted as title agent in the sale of parcels 0190, 0200, and 0350 from Congress Plaza to S&J. During this time, David M. Goldstein, Esq., its director and the person who actually prepared title, had personal and actual knowledge of the Settlement Agreement and of the Congress Management Mortgage. A copy of Schedule B-I of the Title Commitment prepared in connection with the sale of the parcels to S&J, which was faxed from Mr. Goldstein's office, is attached as **Exhibit 7.** Item 8 of that Commitment requires a satisfaction of the Jeff George mortgage, next to which is the handwritten comment "We own." Plaintiff asserts, based on information and belief, that the handwriting is Goldstein's.

41.     The original Jeff George Mortgage, given from Congress Shopping Center to Congress Management, was recorded. As of October 2012, when the transaction was underway, there were no other documents in the Public Records of Palm Beach County, Florida to suggest that Congress Management did not hold the Jeff George Mortgage.

42.    Indeed, Paragraph 8 of Schedule B-I of the Title Commitment, attached as **Exhibit 6**, required "Satisfaction of the Second Mortgage from Congress Shopping Center, Ltd. to Congress Management, LLC, mortgagee(s), recorded under O.R. Book 23655, Page 269, Public Records of Palm Beach County, Florida." The "Second Mortgage" and the Jeff George Mortgage are one and the same.

43.    S&J--either directly or through their attorneys--evidently did raise issue with Congress Management's apparent interest in the parcels that S&J was about to purchase. In a letter dated October 17, 2012, S&J's attorneys required a "payoff estoppel letter from Congress Management" as to the Jeff George Mortgage. See **Exhibit 8.**

44.    S&J apparently inquired further. A copy of what appears to be a working title commitment from the offices of Haile Shaw & Pfaffenberger has several handwritten notes around Paragraph 8--the requirement that Congress Management satisfy the Jeff George Mortgage. These notes strongly suggest that an inquiry was made into Congress 1010's involvement in satisfying that mortgage. A copy of the Buyer's Working Title Commitment is attached as **Exhibit 9.**

45.    Presumably, Congress Plaza produced the unrecorded Assignment of the Jeff George Mortgage as evidence of its ownership. Paragraph 2 of that unrecorded Assignment recites that the balance of the loan is $2.33 million. Did S&J or its attorney's not inquire as to how Congress Plaza came into ownership of a mortgage with a balance of $2.33 million?

46.    On or about September 20, 2013, Congress Plaza executed a deed conveying one of the Six Parcels--that one ending in 0350--to Congress 1010. The deed was recorded on or about that same day. In turn, Congress 1010 executed a deed conveying that same parcel to S&J Property Holdings, LLC on or about November 26, 2013; the deed was recorded on or about

December 11, 2013. (Warranty Deeds attached as **Composite/Exhibit 5-1** and **5-2**.)

47.     Based upon information and belief, S&J partitioned the parcel ending in 0350 into two distinct parcels sometime after September 20, 2013. The two parcels are identifiable by their Palm Beach County Parcel Control Numbers: (a) 00-43-43-29-05-000-0350 and (b) 0043-43-29-05-000-0370. (Warranty Deeds attached as **Composite/Exhibit 5-1 and 5-2**.)

48.     At its Members' Meeting in April 2014, Plaintiff, as sole owner and member of Congress Management, assigned the Subject Note and Mortgage to himself, personally. Due to the time necessary to obtain an appointment at the U.S. Consulate in Germany and some confusion over witness requirements, Plaintiff did not execute the Assignment until November 2014. That assignment was recorded on or about December 5, 2015. (Copy of Minutes and Assignment Attached as **Composite/Exhibit 2-3**.)

49.     In early to mid-2014, Congress Plaza sought refinancing on the parcels ending in 0090, 0150, and 0160 from Fennario Investments, LLC ("Fennario"). A title commitment was prepared in connection with this transaction and is attached as **Exhibit 10**; Item 6 of Schedule B-I requires an affidavit from Congress Plaza affirming that "there are no outstanding judgments, liens, bankruptcies, or other actions which would adversely affect title to the subject property."

50.     On or about May 19, 2014, Suzanne Farese, who is a managing member of Congress Plaza, executed a Title Affidavit in order to satisfy this requirement. Paragraph 17 of the Title Affidavit states that "[t]here are no mortgages encumbering the property, *recorded or unrecorded*, other than those shown on the Settlement Statement." (Emphasis added). A copy of the Title Affidavit is attached as **Composite/Exhibit 11-1**.

51.     At the same time, Suzanne Farese executed a Borrower's Affidavit, attached as **Composite K, Exhibit 2**, affirming that, to her knowledge, "the binder/commitment of Old

Republic National Title Insurance Company under Commitment No 141400 correctly and accurately reflects that status of the title to said property including all liens, mortgages and other encumbrances affecting said property." Plaintiff's mortgage does not appear in the Title Commitment.

52.    As evidenced by the requested modification (**Composite/Exhibit 4-2**) and copies of payments to Congress Management, LLC (**Composite/Exhibit 12-1**), all of which bear Suzanne Farese's signature, Mrs. Farese executed both the Title Affidavit and the Borrower's Affidavit with full knowledge of Plaintiff's outstanding mortgage against 0090, 0150, and 0160.

53.    Mrs. Farese's actions were meant to induce and did induce Fennario to provide funds to Congress Plaza based on Fennario's belief that they were obtaining a first mortgage. Mrs. Farese's intentions are clear from the Borrower's Affidavit, which states that "Affiant makes this Affidavit *for the purpose of inducing Fennario Investments, LLC, a Florida Limited Liability Company to make a mortgage loan to Affiant in the amount of $500,000.00.*" (Emphasis added).

54.    Mrs. Farese's action actually induced Fennario to provide a refinance loan in the amount of $500,000.00, secured by a mortgage against the parcels ending in 0090, 0150, and 0160, as evidenced by the First Lien Affidavit attached as **Composite/Exhibit 11-3.**

55.    Mrs. Farese's actions caused the Congress Management Mortgage to lose priority as a first lien on the property, and limited Plaintiff's ability to enforce the mortgage against the parcels.

56.    On or about August 7, 2014, Congress Management issued a letter to Barry G. Roderman, in his capacity as managing member of and counsel for Congress Plaza, directing that all future mortgage payments should be made to Plaintiff personally. On or about August 13, 2014, Congress Plaza submitted payment to Plaintiff, along with a letter acknowledging the

instructions in the August 7, 2014 letter. (A copy of the August 7th and August 13th letters are attached as **Composite/Exhibit 2-4**.)

57.      In the fall of 2014, Congress Plaza ceased to make payments towards the Subject Note and Mortgage after being served with a Notice of Levy by the Internal Revenue Service, which had made a determination that Congress Management was the alter ego of Harald Dude, the Plaintiff's brother. Steven Crimmins, an IRS agent, allegedly warned Congress Plaza and Thomas R. Farese that any payments due to Congress Management or Harald Dude must be remitted only to the IRS. A copy of the Notice of Levy is attached as **Composite/Exhibit 13-1.** Defendants maintain that the Levy prohibits them from making payment on the Note.

58.      However, the Notice of Levy form issued to Congress Plaza and Mr. Farese was 668-A(ICS). This form of levy is utilized when "the property to be levied is **not** wages, salary or other income" and is not continuous. (Emphasis added) IRM 5.11.2.2.2 (Jan. 1, 2016). *See also*, *What if I Get a Levy Against One of My Employees, Vendors, Customers, or Other Third Parties?*, IRS, https://www.irs.gov/businesses/small-businesses-self-employed/what-if-i-get-a-levy-against-one-of-my-employees-vendors-customers-or-other-third-parties (last visited Dec. 12, 2016).

59.      Mr. Ariel J. Dorra, a Certified Public Accountant who is licensed in Florida and who is uninvolved in this matter, accompanied Harald Dude to a meeting with Mr. Steven Crimmins of the Internal Revenue Service and informed the undersigned counsel that the present suit could be filed and that the case against Harald Dude was not active. Mr. Dorra has executed an affidavit attesting to the events and outcome of this meeting, a copy of which is attached as **Composite/Exhibit 13-2**. All statements and representations made by the undersigned counsel in reference to the IRS levy have been and continue to reflect undersigned counsel's best

knowledge.

60.     About the same time that Congress Plaza ceased to remit payments towards the Note, Congress Management discovered that the Jeff George Mortgage had been satisfied as to all six parcels.

61.     Plaintiff voluntarily dissolved Congress Management on or about March 10, 2015 and did not reinstate the company within 120 days as required by Fla. Stat. § 605.0708(1). Accordingly, Plaintiff is now the owner of any assets previously held by Congress Management by virtue of being the sole member of that LLC.

62.     Since service of the Notice of Levy, no money has been paid to either Congress Management or to Plaintiff individually. Defendants have paid a total of $809,358.00 towards the Congress Management Note; of that, Defendants paid $450,000.00 in principal and $400,900.00 in interest. Interest has continued to accrue at an annual rate of 6 percent. A repayment schedule is attached as **Composite/Exhibit 12-2** and reflects all payments made towards this debt, as well as the accrual of interest thereon. Based on these figures, $2,239,458.00 remains outstanding.

63.     Plaintiff voluntarily dissolved Congress Management on or about March 10, 2015 and did not reinstate the company within 120 days as required by Fla. Stat. § 605.0708(1). Accordingly, Plaintiff is now the owner of any assets previously held by Congress Management by virtue of being the sole member of that LLC.

64.     The Plaintiff has retained the undersigned counsel in this matter and is obligated to pay his attorney a reasonable fee for services.

## COUNT I
### Breach of Contract Against Congress Plaza, LLC and Thomas R. Farese

65.     Plaintiff incorporates the facts stated in Paragraphs 12-64 into this Count I.

66.     Congress Management and Congress Plaza entered into the Agreement on or about May 28, 2010. In consideration of its purchase of the Jeff George Mortgage under that Agreement, Congress Plaza agreed to pay to Congress Management the total sum of $2.48 million. In partial payment thereof, Congress Plaza executed a Promissory Note for $2.31 million, secured by a Mortgage against the Six Parcels, in favor of Congress Management, LLC: the Congress Management Mortgage. All conditions precedent have been performed and waived.

67.     Thomas R. Farese executed the Agreement, as well as the Subject Note and Mortgage, *in his personal capacity* as well as on behalf of Congress Plaza.

68.     Upon execution of the Agreement, Congress Plaza was considered the owner of the Jeff George Mortgage. (**Exhibit 1,** Agreement, ¶ 3.)

69.     Congress Plaza's obligations under that Agreement included full payment of the Congress Management Mortgage according to the schedule described therein. (**Exhibit 1,** Agreement, ¶ 9.)

70.     To date, however, Congress Plaza has paid only $859,900.00 towards the debt. (*See* Repayment Schedule attached as **Composite/Exhibit 12-2**)

71.     Per the terms of the Agreement, Congress Plaza purchased the Jeff George Mortgage from Congress Management for consideration of $2.48 million and agreed to foreclose the Jeff George Mortgage as to the Six Parcels. Congress Plaza issued a $2.31 million promissory note to Congress Management as partial payment; performance of the contract is incomplete until that Note is paid in full. Plaintiff, as the sole owner of the now-dissolved Congress Management has not enjoyed the full benefit of the bargain.

72.     By failing to make monthly installment payments to the holder of the Subject Note and Mortgage, Congress Plaza has not fulfilled its obligations, resulting in a material breach of the Agreement.

73.     As a result of Congress Plaza's material breach, Plaintiff has incurred damages in the amount of $2,239,458.00, which is the outstanding principal of the note plus interest due through May 2017. See the repayment schedule attached as **Composite/Exhibit 12-2.**

74.     The Agreement provides that "[t]he prevailing party in any litigation brought either to interpret or otherwise enforce this Agreement shall be entitled to recover their attorneys' fees and costs from the non-prevailing party." (**Exhibit 1,** Agreement, ¶ 17.)

WHEREFORE, Plaintiff respectfully requests this Court enter a judgment in favor of the Plaintiff and against the Defendants and award Plaintiff money damages in the full amount due on the accelerated Note. Plaintiff further requests attorneys' fees and costs and such other relief as this Court deems just and proper.

## COUNT II
## Foreclosure of Mortgage Against Congress Plaza, LLC and S&J Property Holdings, LLC

75.     Plaintiff incorporates the facts stated in Paragraphs 12-64 into this Count II.

76.     Plaintiff is the owner and holder of the Congress Management Mortgage and maintains the right to enforce all interests therein, including but not limited to the right to maintain this foreclosure action, by virtue of an unconditional transfer to the Plaintiff of all such interests, which occurred prior to the filing of this action. (See **Composite/Exhibit 2-3,** Minutes and Assignment.)

77.     The Congress Management Mortgage ballooned in May 2017. Principal and interest in the amount of $2,239,458.00 is due and owing. (Affidavit of Current Mortgage attached as **Composite/Exhibit 2-5;** *see also,* **Composite/Exhibit 12-2,** Repayment Schedule**.**)

78.     The fact that Plaintiff has not recorded the Subject Note and Mortgage does not prevent Plaintiff from now enforcing the mortgage. *Gervetz v. Gervetz*, 566 So. 2d 541, 544 (Fla. 3d DCA, 1990). Per Paragraph 8 of the Settlement Agreement (see **Exhibit 1**), Congress Plaza was to advance the full cost of the fees necessary to record the Subject Note and Mortgage and would receive a credit towards the balloon payment due in May 2017 of 50 percent of the amount of recording fees. On October 26, 2016, Plaintiff, through the undersigned counsel, requested the recording fees from Congress Plaza in a letter delivered via certified mail and e-mail. Congress Plaza refused. (Letter and e-mails attached as **Exhibit 14**.)

79.     S&J purchased the parcels ending in 0190 and 0200 from Congress Plaza, and subsequently acquired the parcel ending in 0350 from Congress 1010. *See* Warranty Deeds, **Composite/Exhibit 5-1 and 5-2.** At the time, Congress Management's unrecorded mortgage was outstanding and Congress Plaza was, on the whole, remitting monthly payments. *See* Repayment Schedule, **Composite/Exhibit 12-2.**

80.     David M. Goldstein acted as title agent in the Congress Plaza sale to S&J. He is also a managing member of Congress Plaza as trustee of the Nolita Trust, which, based on information and belief, holds his membership interest in Congress Plaza. He was involved in negotiating the Settlement Agreement and had knowledge of the Congress Management Mortgage as evidenced, in part, by his deliverance of the $400,000.00 check to Congress Management as a principal payment towards the debt and as proposed consideration for Congress Management's agreement to the Requested Modification.

81.     Barry G. Roderman helped to facilitate the sale of the property from Congress Plaza to S&J, signing most of the paperwork in the transaction on behalf of Congress Plaza as its managing member. Mr. Roderman is also the manager of Congress 1010. He was involved in

negotiating the Settlement Agreement and had knowledge of the Congress Management Mortgage as evidenced, in part, by his drawing the $400,000.00 check to Congress Management as principal payment towards the debt and as proposed consideration for Congress Management's agreement to the Requested Modification.

82.     Florida Statute § 695.01(1) provides that "no . . . mortgage of real property . . . shall be good and effectual in law or equity against creditors or subsequent purchasers for valuable consideration *and without notice* unless the same be recorded according to law." (Emphasis added.) The burden of showing that the purchaser had notice of the prior unrecorded instrument is "upon the party claiming under such unrecorded instrument." *Rambo v. Dickenson*, 110 So. 352, 352 (Fla. 1926).

83.     While Plaintiff did not record the Subject Note and Mortgage, Congress Plaza also did not record the Assignment of the Jeff George mortgage from Congress Management to Congress Plaza. When the conveyances of 0190, 0200, and 0350 took place, Congress Management was the record holder of the Jeff George mortgage.

84.     Congress Management's apparent interest in the property was made known to S&J by virtue of a Title Commitment prepared in the course of this transaction. Paragraph 8 of Schedule B-I of that Title Commitment required "satisfaction of the Second Mortgage from Congress Shopping Center, Ltd. to Congress Management, LLC, mortgagee(s)." A copy of the Title Commitment is attached as **Exhibit 6.**

85.     The requirement of Paragraph 8 did not pass unnoticed. In a letter dated October 17, 2012 from Lawrence C. Griffin, an attorney with the firm Haile Shaw & Pfaffenberger which represented S&J in this transaction, to Goldstein, Griffin required that, prior to closing, Congress Plaza deliver "[a] payoff estoppel letter from Congress Management LLC confirming its

agreement to satisfy (or otherwise release the subject property from) the second mortgage in the original principal amount of $2,330,000.00 in requirement 8." *See* Letter to David Goldstein, **Exhibit 8.**

86.     Mr. Griffin raised questions about a mortgage, apparently held by Congress Management, that Congress Plaza actually owned. It is inconceivable that the correspondence between Mr. Griffin and Mr. Goldstein described in subparagraphs (e) and (f) above did not lead to, at the very least, a conversation about Congress Management, LLC and whether it remained an interest holder in the parcels which were the subject of the transaction.

87.     It is also inconceivable that S&J, which was represented by counsel in this transaction, would have closed on the property in the absence of some assurance that they were purchasing good and marketable title unless the cloud on the title was a risk that S&J determined that it would be willing to assume.

88.     Further questions were apparently raised by S&J's attorneys. A copy of what appears to be a working copy of the title commitment from the offices of Haile Shaw & Pfaffenberger has several handwritten notes around Paragraph 8--the requirement that Congress Management satisfy the Jeff George Mortgage--which suggest that they made an inquiry into Congress 1010's involvement in satisfying that mortgage. *See* Buyer's Working Title Commitment, **Exhibit 9.**

89.     Because the transaction did close, one of two things must have happened when S&J's counsel requested the payoff estoppel letter from Congress Management: the existence of unrecorded mortgage from Congress Plaza to Congress Management was disclosed as a key element of how Congress Plaza came to hold the Jeff George mortgage, and S&J decided that it would continue with the transaction nevertheless; or it was simply represented to S&J that

Congress Plaza owned the Jeff George Mortgage without any further explanation.

90.    For the purposes of this Count III, Plaintiff alleges that the Congress Management mortgage was disclosed to S&J and its counsel, and that S&J closed the transaction with actual knowledge of the unrecorded Congress Management mortgage.

91.    Plaintiff is inclined, moreover, to believe that S&J was made aware of the unrecorded Congress Management mortgage. As described in Paragraph 60, S&J's attorneys requested a "payoff estoppel letter from Congress Management LLC confirming its agreement to satisfy (or otherwise release the subject property from) the second mortgage . . . in requirement 8" in a letter addressed to David M. Goldstein.

92.    A document entitled "Real Estate Purchase Agreement Closing Documents" in the buyer's file contains a handwritten note that estoppel certificates would be provided "Post Closing." (A copy of this Worksheet is attached as **Exhibit 15**). It is difficult to contemplate why such an arrangement would be acceptable to S&J unless an understanding had been reached that Congress Management would not pose a problem.

93.    In *Rambo v. Dickenson*, the Florida Supreme Court held that a buyer did not have actual notice of a timber lease that was recorded two months after the buyer's deed was recorded, and that the buyer was therefore a bona fide purchaser. The lease in *Rambo* concerned property which spanned Jackson County, Florida into Alabama. The lease holders sought a rehearing after they discovered that the seller of the property--and the grantor of the timber lease--had discussed the lease with the buyer in the buyer's attorney's office prior to closing after the buyer discovered a reservation in the deed of the timber on the Alabama portion of the property. The Court denied the rehearing, stating that

> these discussions were not sufficient to show notice to the [buyer], or to the
> attorney who was acting as attorney for both parties, of the previous transfer by

> the grantors of the timber on the Florida lands covered by the unrecorded deed or lease to [leasees]. All of the statements made might reasonably have been construed to have applied to the timber covered by the reservation in the deed that is, the timber on the Alabama portion of the place.

*See Rambo v. Dickenson*, 110 So. 352, 353 (Fla. 1926).

94.     This case is distinguishable from *Rambo*. Based on the Title Commitment and October 17, 2012 letter from Mr. Griffin to Mr. Goldstein, it is entirely reasonable to assert that the interests of Congress Management, LLC in the property were a topic of conversation between Congress Plaza and S&J, either directly or through their attorneys, prior to the closing.

95.     Moreover, Mr. Goldstein both helped to prepare, or knew about, the Settlement Agreement that gave rise to Congress Management's mortgage and acted as title agent in the sale of the three parcels to S&J. He therefore had a duty to disclose the existence of the Agreement and of Congress Management's mortgage to the buyer, or else to withdraw. *See Daniel v. Coastal Bonded Title Co.*, 539 So. 2d 567, 568-69 (Fla. 5th DCA, 1989); *Askew v. Allstate Title & Abstract Co., Inc.*, 603 So. 2d 29, 31 (Fla. 2d DCA, 1992).

96.     Pursuant to the elimination of the Jeff George Mortgage by either unity of title or satisfaction, Plaintiff has a first priority, duly perfected lien on those Six Parcels described in the Subject Note and Mortgage, including, but not limited to, the rental income derived therefrom.

97.     Upon information and belief, the record legal title to the Six Parcels is now vested as follows:

      a.     S&J is the owner of record of the parcels ending in 0190, 0200, and 0350; 0350 has been subdivided into parcels ending in 0350 and 0370.

      b.     Congress Plaza is the owner of record of the parcels ending in 0160, 0150, and 0090. Those parcels were encumbered by a mortgage held by Fennario Investments, LLC; however, that mortgage ballooned on June 1,

Dude v. Congress Plaza, LLC • Second Amended Complaint

2017.

98.     Congress Plaza has defaulted under the covenants, terms, and agreements of the Subject Note and Mortgage by failing to make the payment due in November 2014 and all subsequent payments.

99.     As a result of the aforementioned default and in accordance with the provisions of the Subject Note, Plaintiff elected to accelerate the maturity of the note and declared the entire unpaid balance immediately due and payable. Plaintiff delivered to Congress Plaza the Notice of Acceleration via Certified Mail, Return Receipt Requested, on August 5, 2016, and via e-mail. (Copy of Notice attached as **Exhibit 16.**)

100.    Congress Plaza failed to cure the default by remitting payment of the entire amount of indebtedness within the allotted 30 days, and did not contact Plaintiff's counsel to make alternative payment arrangements within that same time period.

101.    Under the terms of the Note, $2,239,458, plus additional fees and costs are due and owing to Plaintiff. *See* Repayment Schedule, **Composite/Exhibit 12-2**.

102.    In order to protect its security, Plaintiff may have advanced and paid ad valorem taxes, premiums, or insurance required by the Subject Mortgage and other necessary costs, or may be required to make such advances during the pendency of this action. Any such sum so paid will be due and owing to Plaintiff.

103.    All conditions precedent to the actions asserted in this Complaint have been satisfied, waived, or otherwise discharged.

104.    Congress Plaza may claim interest in the Six Parcels, as well as the parcel ending in 0370, and the rental income thereon, but such interest is subordinate to that of Plaintiff.

105.    Plaintiff alleges that the claims of the remaining Defendants are secondary, junior,

Dude v. Congress Plaza, LLC • Second Amended Complaint

inferior, and subject to the prior claim of Plaintiff. More particularly, the remaining Defendants may claim some right, title, and interest in and to the Six Parcels in the following manner:

(a)     The Defendant, S&J PROPERTY HOLDINGS, LLC, may claim some right, title, or interest in the property herein sought to be foreclosed by virtue of the Warranty Deed executed by Congress Plaza on October 29, 2012 conveying title to the parcels ending in 0190 and 0200 to S&J, recorded at OR Book and Page 25681/0476 in the Official Records of Palm Beach County; and by the Special Warranty Deed executed by Congress 1010 on September 20, 2013 conveying title to the parcel ending in 0350 to S&J and recorded at OR Book and Page 26337/1179 in the Official Records of Palm Beach County, which was corrected by virtue of the execution of a second Special Warranty Deed by Congress 1010 on June 9, 2014 and recorded at OR Book and Page 26863/0005 in the Official Records of Palm Beach County, Florida, as well as interest in the parcel ending in 0370 which was previous part of 0350 (See Warranty Deeds, **Composite/Exhibit 5-1** and **5-2**). However, said interest, if any, is subordinate, junior, and inferior to the lien of Plaintiff's mortgage.

106.    In addition to all other named Defendants, the unknown spouses, heirs, devisees, grantees, assignees, creditors, trustees, successors in interest or other parties claiming an interest in the Collateral, by, through, under or against any of said Defendants, whether natural or corporate, who are not known to be dead or alive, dissolved or existing, are joined as Defendants. The claims of any said parties are subject, subordinate, and inferior to the lien of the Subject Mortgage held by Plaintiff.

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment to (a) permit Plaintiff to amend and renew the Notice of Lis Pendens which is recorded in the Palm Beach County Official Records at Bk/Pg 28622/43; (b) declare that the Defendants and all persons claiming by, under or through them or any of them subsequent to the filing of an amended Notice of Lis Pendens in this action shall be barred and forever foreclosed of and from all or any action, right, title, interest, claim, lien or equity of redemption in, to, or upon the Property and each and every part thereof; (c) ascertain the amount due to Plaintiff under the Subject Note and Mortgage and award judgment to Plaintiff thereto; (d) issue orders to show cause and judgments pursuant to FLA. STAT. § 702.10; (e) order the Six Parcels to be sold to satisfy the claims of Plaintiff under the Subject Note and Mortgage in accordance with the provisions of FLA. STAT. § 45.031; (f) retain jurisdiction of this action to make any and all further orders and judgments as may be necessary and proper, including the issuance of a writ of possession and the entry of a deficiency decree, unless any Defendant personally liable is discharged from liability pursuant to the provisions of the Bankruptcy Code, 11 U.S.C. § 101, et seq.; (g) award Plaintiff one-half of the cost of recording fees payable by Congress Plaza in accordance with Paragraph 8 of the Settlement Agreement; and (h) award Plaintiff attorneys fees and costs and such other relief as may be appropriate under the circumstances.

### **COUNT III**
### **Breach of Fiduciary Duty Against David M. Goldstein, individually, and David M. Goldstein, P.A.**

107.    Plaintiff incorporates the facts stated in Paragraphs 12-64 into this Count III.

108.    As discussed more fully in Paragraphs 84 through 89 of this Complaint, Plaintiff alleges that S&J made inquiry into Congress Management's apparent interest in the property that S&J was purchasing. *Infra*, Paragraphs 84-89.

109.    Plaintiff asserts in Paragraph 86 that because the transaction closed, Congress Plaza must have either disclosed the existence of unrecorded mortgage from Congress Plaza to Congress Management or simply represented to S&J that Congress Plaza owned the Jeff George Mortgage without any further explanation.

110.    FED. R. CIV. P. 8(d)(2) provides that "a party may set out 2 or more statements of a claim or defense alternatively or hypothetically, either in a single count or defense or in separate ones."

111.    FED R. CIV. P. 8(d)(3) further provides that "a party may state as many separate claims or defenses as it has, *regardless of consistency*." (Emphasis added.)

112.    Count II is based on the assertion that S&J purchased the property with actual knowledge of the Congress Management's unrecorded mortgage; Count III is based on the assertion that Congress Management's mortgage was concealed from S&J.

113.    David M. Goldstein, through his law firm, David M. Goldstein, P.A., prepared title and acted as closing agent in the sale of the parcels 0190, 0200, and 0350 from Congress Plaza to S&J. As such, Mr. Goldstein was obligated to supervise the closing "in a reasonably prudent manner." *Florida Southern Abstract & Title Co. v. Bjellos*, 346 So. 2d 635, 636 (Fla. 2d DCA, 1977). Mr. Goldstein and Goldstein Law, as the title agent and closing agent, owed "a fiduciary duty to both the buyer and the seller, two potentially conflicting parties." *Askew v. Allstate Title & Abstract Co., Inc.*, 603 So. 2d 29, 31 (Fla. 2d DCA, 1992). This includes the duty to disclose all relevant material facts and "where an actual conflict arises . . . to withdraw, not to disclose." *Sudberry v. Lowke*, 403 So. 2d 1117, 1118 (Fla. 5th DCA, 1981); *Askew*, 603 So. 2d at 31.

114.    Mr. Goldstein, as an interest holder in and attorney for Congress Plaza, possessed

personal and actual knowledge of the Settlement Agreement and of Plaintiff's Note and the Mortgage encumbering the Six Parcels, as well as personal and actual knowledge that none of those documents were recorded, while he was engaged in the preparation of title and at the time of closing. This knowledge is evidenced by the title commitment attached as **Exhibit 7** as well as his involvement in seeking a modification of the note as described in Paragraph 21 of this Complaint.

115.    "A material fact is generally defined as one to which a reasonable person would attach importance in determining a choice of action." *Silverman v. Pitterman*, 574 So. 2d 275, 246 (Fla. 3d DCA, 1991). The existence of an unrecorded mortgage should lead a reasonable person to take action to satisfy or subordinate the lien, or else to potentially decline to purchase a property. This is supported by the fact that, prior to closing, Congress Plaza requested a modification of the Settlement Agreement, including the satisfaction of Plaintiff's mortgage as to Parcels 0190, 200, and 0350. (*See* **Composite/Exhibit 4-2,** Requested Modification.)

116.    Mr. Goldstein's failure to disclose to S&J the existence of Plaintiff's mortgage, of which he had actual knowledge, resulted in Plaintiff's loss of priority of his lien, thereby limiting his ability to exercise his rights to foreclose upon 0190, 0200, and 0350 in order to collect monies owed to him by Congress Plaza.

117.    Plaintiff's loss of priority of the Subject Mortgage was a foreseeable result of Mr. Goldstein's actions.

WHEREFORE, Plaintiff respectfully requests that this court enter judgment in favor of the Plaintiff and against the defendants Mr. Goldstein and Goldstein Law and award Plaintiff money damages in an amount equal to the loss resulting from the defendants' breach of fiduciary duty. Plaintiff further requests attorneys' fees and costs and such other relief as this Court deems

just and proper.

## COUNT IV
### Fraud and Deceit Against Congress Plaza, LLC, Congress 1010, LLC, David Goldstein, P.A., David M. Goldstein, individually, Barry G. Roderman, individually, and Suzanne Farese, individually.

118.   Plaintiff incorporates the facts stated in Paragraphs 12-64 into this Count IV.

119.   As discussed more fully in Paragraphs 84 through 89 of this Complaint, Plaintiff alleges that S&J made inquiry into Congress Management's apparent interest in the property that S&J was purchasing. *Infra*, Paragraphs 81-86.

120.   Plaintiff asserts in Paragraph 86 that because the transaction closed, Congress Plaza must have either disclosed the existence of unrecorded mortgage from Congress Plaza to Congress Management or simply represented to S&J that Congress Plaza owned the Jeff George Mortgage without any further explanation.

121.   FED. R. CIV. P. 8(d)(2) provides that "a party may set out 2 or more statements of a claim or defense alternatively or hypothetically, either in a single count or defense or in separate ones."

122.   FED R. CIV. P. 8(d)(3) further provides that "a party may state as many separate claims or defenses as it has, *regardless of consistency*." (Emphasis added.)

123.   Count II is based on the assertion that S&J purchased the property with actual knowledge of the Congress Management's unrecorded mortgage; Count IV is based on the assertion that Congress Management's mortgage was concealed from S&J in 2012 and from Fennario Investments, LLC ("Fennario") during a refinance transaction in 2014.

124.   In connection with the sale of three parcels to S&J, Barry G. Roderman executed a Satisfaction of the Jeff George Mortgage as the manager of Congress 1010 on or about December 5, 2012. On behalf of Congress Plaza, Roderman executed an assignment of that same

mortgage to Congress 1010 on or about January 10, 2014. David M. Goldstein prepared title for the transaction through Goldstein Law, his professional corporation.

125.    Based on information and belief, Suzanne Farese is a managing member of Congress Plaza and executed documents in her capacity as managing member which had the effect of purposefully concealing Plaintiff's mortgage.

126.    "It is generally held that a corporation is vicariously liable for fraud and misrepresentation practiced by its directors or agents within the scope of their employment. A corollary to this rule is that said directors and agents are also liable individually." *Ramel v. Chasebrook Const. Co.*, 135 So. 2d 876, 883 (Fla. 2d DCA, 1961). Mr. Roderman, Mr. Goldstein, and Mrs. Farese are therefore properly named as individual defendants.

127.    In or around October 2012, when Congress Plaza sold the parcels ending in 0190, 0200, 0350 to S&J, Plaintiff's predecessor Congress Management held a valid, albeit unrecorded, mortgage encumbering all Six Parcels. Mr. Roderman, Mr. Goldstein, and Mrs. Farese, as managing members and authorized representatives of Congress Plaza, Congress 1010, and/or Goldstein Law, possessed actual knowledge of this mortgage, as evidenced by, *inter alia*, Congress Plaza's request that the mortgage be modified as to the three parcels in advance of the sale, which Congress Management refused. (**Composite/Exhibit 4-2,** Requested Modification).

128.    The original Jeff George Mortgage, given from Congress Shopping Center to Congress Management, was recorded. As of October 2012, when the transaction was underway, there were no other documents in the Public Records of Palm Beach County, Florida to suggest that Congress Management did not hold the Jeff George Mortgage.

129.    Indeed, Paragraph 8 of Schedule B-I of the Title Commitment, attached as **Exhibit F**, required "Satisfaction of the Second Mortgage from Congress Shopping Center, Ltd.

to Congress Management, LLC, mortgagee(s), recorded under O.R. Book 23655, Page 269, Public Records of Palm Beach County, Florida." The "Second Mortgage" and the Jeff George Mortgage are one and the same.

130.    S&J--either directly or through their attorneys--evidently did raise issue with Congress Management's apparent interest in the parcels that S&J was about to purchase. In a letter dated October 17, 2012, S&J's attorneys required a "payoff estoppel letter from Congress Management" as to the Jeff George Mortgage. See **Exhibit 8.**

131.    S&J apparently inquired further. A copy of what appears to be a working title commitment from the offices of Haile Shaw & Pfaffenberger has several handwritten notes around Paragraph 8--the requirement that Congress Management satisfy the Jeff George Mortgage. These notes strongly suggest that an inquiry was made into Congress 1010's involvement in satisfying that mortgage. A copy of the Buyer's Working Title Commitment is attached as **Exhibit 9.**

132.    Presumably, Congress Plaza produced the unrecorded Assignment of the Jeff George Mortgage as evidence of its ownership. Paragraph 2 of that unrecorded Assignment recites that the balance of the loan is $2.33 million. Did S&J or its attorney's not inquire as to how Congress Plaza came into ownership of a mortgage with a balance of $2.33 million?

133.    Even if S&J did not inquire as to the particulars of the unrecorded Assignment, however, it was not sufficient to merely point to the Assignment of the Jeff George Mortgage from Congress Management to Congress Plaza, or to suggest that the Jeff George Mortgage had merged by virtue of the unity of title to the parcels and the mortgage which occurred when Congress Plaza procured the property from Congress Shopping Center in or around June 2010. "Even though a party to a transaction owes no duty to disclose facts within his knowledge or to

answer inquiries respecting such facts, if he undertakes to do so he must disclose the whole truth." *Ramel v. Chasebrook Const. Co.*, 135 So. 2d 876, 882 (Fla. 2d DCA, 1961).

134.    David M. Goldstein, as the title agent and closing agent, owed a duty to disclose to S&J the existence of Plaintiff's mortgage, of which he possessed actual knowledge, or to withdraw in the event that a conflict arose between buyer and seller.  *Sudberry v. Lowke*, 403 So. 2d 1117, 1118 (Fla. 5th DCA, 1981); *Askew v. Allstate Title & Abstract Co., Inc.*, 603 So. 2d 29, 31 (Fla. 2d DCA, 1992). Mr. Goldstein did neither, and instead approved the transaction while he knew of--but did not disclose--a third party interest in the property.

135.    Congress Plaza took affirmative steps to conceal the existence of Plaintiff's mortgage. Congress Plaza first approached Congress Management to request a modification of the Settlement Agreement and release of the Subject Mortgage as to the parcels ending in 0190, 0200, and 0350. Congress Management refused to modify the Agreement or to release the mortgage, in whole or in part. Within a month--on or about October 22, 2012--Barry G. Roderman, Congress Plaza's managing member, established Congress 1010, LLC. Mr. Roderman proceeded to satisfy the Jeff George Mortgage on behalf of Congress 1010 on December 5, 2012 (**Composite/Exhibit 3-3**). Mr. Roderman later acted on behalf of Congress Plaza and assigned the Jeff George Mortgage to Congress 1010 on January 10, 2014; the assignment had an effective date of December 5, 2012 (**Composite/Exhibit 3-4**).

136.    The Assignment of the Jeff George Mortgage from Congress Plaza to Congress 1010 contains an affirmative representation that Congress Plaza "own[ed] the Loan Documents free and clear of all liens and encumbrances." (*See* **Composite/Exhibit 3-4,** Assignment, ¶ 3). Mr. Roderman had personal and actual knowledge of the Settlement Agreement and of the Subject Note and Mortgage on December 5, 2016, including the fact that Congress Plaza owed

money to Congress Management, Plaintiff's predecessor, for Congress Plaza's purchase of the Jeff George Mortgage.

137.    By concealing the existence of the Subject Note and Mortgage, Congress Plaza, Congress 1010, and their counsel intended to cause S&J to conclude that no third party held an interest in the property and to induce S&J to complete the purchase of the parcels ending in 0190, 0200, and 0350.

138.    S&J closed on the parcels ending in 0190 and 0200 on October 29, 2012. The fact that closing occurred prior to the Assignment and Satisfaction of the Jeff George Mortgage is further suggestive of the fact that Congress Plaza, Congress 1010, Barry G. Roderman, and David M. Goldstein concealed the existence of the Subject Note and Mortgage from S&J, that Mr. Goldstein--a title agent who owed a fiduciary duty to the buyer and to seller--approved the transaction despite having actual knowledge of a third party interest in the parcels, and that the defendants took affirmative action after the fact to cover their tracks.

139.    Congress Plaza conveyed 0350 to Congress 1010 on or about September 20, 2013; S&J subsequently purchased that parcel from Congress 1010 on or about November 26, 2013.

140.    S&J purchased the parcels ending in 0190, 0200, and 0350 in reliance on the representations made by Congress Plaza, Congress 1010, Barry G. Roderman, David M. Goldstein, and Goldstein Law. As a result, Plaintiff lost priority of his lien, thereby limiting his ability to exercise his rights to foreclose upon 0190, 0200, and 0350 in order to collect monies owed to him by Congress Plaza.

141.    The Title Commitment revealed the original Jeff George Mortgage from Congress Shopping Center to Congress Management. No assignment or satisfaction of the Jeff George

Mortgage was recorded at the time. S&J had notice of a possible third party interest in the property--namely, that Congress Management might hold a mortgage encumbering the parcels S&J was seeking to purchase--and requested an estoppel letter from Congress Management. The transaction closed without an estoppel letter or satisfaction from Congress Management. It is not a quantum leap to assert that Congress Plaza, Barry G. Roderman, and/or David M. Goldstein undertook efforts to ensure S&J that title to the property was marketable; in doing so, they were required to "disclose the whole truth." *Ramel*, 135 at 882.

142.     The fact that The Fund issued title, that S&J closed the transaction, and that the Jeff George Mortgage was assigned and satisfied after the fact makes it evident that Congress Plaza, Congress 1010, Barry G. Roderman, and David M. Goldstein not only failed to disclose the existence of the Subject Note and Mortgage despite having actual knowledge of it, but took steps to actively conceal its existence from S&J.

143.     In 2014, Congress Plaza sought refinancing on the parcels ending in 0090, 0150, and 0160 from Fennario. A title commitment was prepared in connection with this transaction and a copy is attached as **Exhibit 10**; Item 6 of Schedule B-I requires an affidavit from Congress Plaza affirming that "there are no outstanding judgments, liens, bankruptcies, or other actions which would adversely affect title to the subject property."

144.     On or about May 19, 2014, Suzanne Farese executed a Title Affidavit in the course of a refinance transaction with Fennario, which resulted in Fennario obtaining a mortgage against the parcels ending in 0090, 0150, and 0160. Paragraph 17 of the Title Affidavit states that "[t]here are no mortgages encumbering the property, ***recorded or unrecorded***, other than those shown on the Settlement Statement." (Emphasis added). A copy of the Title Affidavit is attached as **Composite/Exhibit 11-1.**

145.    Suzanne Farese also executed a Borrower's Affidavit, attached as **Composite/Exhibit 11-2,** affirming that, to her knowledge, "the binder/commitment of Old Republic National Title Insurance Company under Commitment No 141400 correctly and accurately reflects that status of the title to said property including all liens, mortgages and other encumbrances affecting said property." Plaintiff's mortgage does not appear in the Title Commitment.

146.    As evidenced by the requested modification attached as **Composite/Exhibit 4-2** and copies of payments to Congress Management, LLC (**Composite/Exhibit 12-1**), all of which bear Suzanne Farese's signature, Mrs. Farese executed both the Title Affidavit and the Borrower's Affidavit with full knowledge of Plaintiff's outstanding mortgage against 0090, 0150, and 0160.

147.    Mrs. Farese's actions were meant to induce and did induce Fennario to provide funds to Congress Plaza based on Fennario's belief that they were obtaining a first mortgage.

148.    Mrs. Farese's intentions are clear from the Borrower's Affidavit, which states that "Affiant makes this Affidavit *for the purpose of inducing Fennario Investments, LLC, a Florida Limited Liability Company to make a mortgage loan to Affiant in the amount of $500,000.00.*" (Emphasis added). Fennario was actually induced into providing the mortgage loan, as evidenced by the First Lien Affidavit attached as **Composite/Exhibit 11-3.**

149.    Mrs. Farese's actions caused Plaintiff to suffer loss of priority in his ability to enforce his mortgage as to the parcels ending in 0090, 0150, and 0160.

WHEREFORE, Plaintiff respectfully requests that this court enter judgment in favor of the Plaintiff and against the defendants Congress Plaza, Congress 1010, Mr. Goldstein, Goldstein Law, Barry G. Roderman, and Suzanne Farese and award Plaintiff money damages in an amount

equal to Plaintiff's loss as a result of the defendants' fraudulent actions. Plaintiff further requests attorneys' fees and costs and such other relief as this Court deems just and proper.

### <u>COUNT V</u>
### Civil Conspiracy to Commit Fraud against Barry G. Roderman, David M. Goldstein, and Suzanne Farese

150.   Plaintiff incorporates the facts stated in Paragraphs 12-64 into this Count V.

151.   Pursuant to the Settlement Agreement entered into on May 28, 2010, Congress Plaza purchased the Jeff George Mortgage from Congress Management. As partial payment, Congress Plaza executed and delivered to Congress Management a promissory note in the amount of $2.31 million. The Note was further secured by a mortgage against the Six Parcels.

152.   Congress Management executed and delivered an Assignment of the Jeff George Mortgage to Congress Plaza on May 28, 2010 pursuant to the terms of the Agreement.

153.   At all relevant times, David M. Goldstein, Barry G. Roderman, and Suzanne Farese were managing members of Congress Plaza who had actual knowledge of the Agreement and of the Note and Mortgage held by Congress Management. Furthermore, they knew that the mortgage held by Congress Management was not recorded.

154.   David M. Goldstein, Barry G. Roderman, and Suzanne Farese took actions to cause Congress Plaza to undertake several real estate transactions. The first involved a sale of parcels ending in 0190, 0200, and 0350 to S&J in 2012; the second was a refinance of the remaining three parcels ending in 0090, 0150, and 0160 with Fennario in 2014.

155.   At the time that both of these transactions took place, David M. Goldstein, Barry G. Roderman, and Suzanne Farese knew of both the debt owed to Congress Management and that the parcels were encumbered by Congress Management's unrecorded mortgage. This is evidenced by Congress Plaza's requested modification and requested partial release of the

Congress Management's mortgage signed by Suzanne Farese in October 2012; by the $400,000.00 check issued from Barry G. Roderman's IOLTA Account on September 20, 2014 containing the memo "Reduction Payment/Modification of Note" and David M. Goldstein's deliverance of that check to Harald Dude, the authorized representative of Congress Managment; and by Congress Plaza's monthly payments to Congress Management, which continued through most of 2014, tendered in the form of checks signed by Suzanne Farese.

156.    In order for the transactions in 2012 and 2014 to close, it was necessary to remove clouds on the title. This is evidenced by the S&J title commitment attached as **Exhibit 6**, and the Fennario title commitment attached as **Exhibit 10**, both of which require the satisfaction of mortgages recorded in the public records--the Jeff George Mortgage in the case of S&J, and a mortgage held by Corvinia in the case of Fennario. The Fennario title commitment also required "a General/Non-ID Affidavit from Congress Plaza LLC a Florida limited liability company that, to the best of his/her/their knowledge, there are no outstanding judgments, liens, bankruptcies, incapacities, or other actions which would adversely affect title to the subject property." Fennario Title Commitment, Schedule B-I, ¶ 6.

157.    Problems with clearing title first arose when Congress Management refused to execute the Requested Modification in September 2012 in the midst of the S&J transaction. The transaction was apparently set to close on or about October 29, 2012, and it is highly unlikely that Old Republic would have insured title if the existence of Congress Management's mortgage was known.

158.    As noted in Paragraph 95 of this Complaint, the S&J title commitment required that the Jeff George Mortgage be satisfied. Someone--who Plaintiff alleges to be David M. Goldstein based on information and belief--hand wrote "We own," next to the requirement.

Plaintiff, again based on information and belief, alleges that this comment is an allusion to Congress Plaza's ownership of the Jeff George mortgage pursuant to the Settlement Agreement.

159.    Congress Plaza could have simply satisfied the Jeff George mortgage itself. Plaintiff alleges, however, that the members of Congress Plaza recognized the Jeff George Mortgage for what it was: a loose thread which, if pulled at, would unravel the whole fabric of the S&J closing. A satisfaction from Congress Plaza would have raised questions about why the company held a mortgage against property it owned, a line of inquiry that, if answered truthfully, inevitably leads to the Settlement Agreement and Congress Management's mortgage. With Congress Management refusing to agree to a partial satisfaction of the unrecorded mortgage, this was a line of questioning that Congress Plaza desperately needed to avoid.

160.    Barry G. Roderman formed Congress 1010 on October 22, 2012--a mere week before the S&J transaction apparently closed. Congress 1010 appears to serve little purpose other than to provide a buffer for Congress Plaza; a screenshot of the search results for "Congress 1010 LLC" in the public records of Palm Beach County, Florida is attached as **Exhibit 17**; all appear to be directly or closely related to the S&J and Fennario transactions.

161.    In connection with the S&J transaction, Barry G. Roderman executed a Satisfaction of the Jeff George Mortgage on behalf of Congress 1010 on December 5, 2012. At that time, Congress Plaza was still the holder of that mortgage. An Assignment of the Jeff George Mortgage from Congress Plaza to Congress 1010 was not executed until January 10, 2014, again by Barry G. Roderman--this time as managing member of Congress Plaza. Moreover, Paragraph 3 of the Assignment of the Jeff George Mortgage from Congress Plaza to Congress 1010 provides that Congress Plaza "represents, warrants, and covenants that (a) [Congress Plaza] owns the Loan Documents *free and clear of all liens and encumbrances*."

(**Composite/Exhibit 3-2,** Assignment, ¶ 3) (emphasis added).

162.    Forming and using Congress 1010 to execute a Satisfaction of the Jeff George Mortgage relieved Congress Plaza from its role as mortgagee of the Jeff George Mortgage, and attenuated Congress Plaza's connection with Congress Management such that a casual observer might be far less inclined to pull at that loose thread.

163.    The parcels were also encumbered by a mortgage held by John George and Corvinia, LLC (the "Corvinia Mortgage"). Pursuant to the Settlement Agreement, Congress Plaza had agreed to foreclose the Jeff George Mortgage and take ownership of the Six Parcels. The foreclosure proceedings were filed but were voluntarily dismissed when Congress Plaza reached an agreement with Congress Shopping Center to take over ownership of the Six Parcels; as part of that agreement, Congress Plaza granted the Corvinia Mortgage, which is recorded at OR Bk/Pg 24125/628 of the Public Records of Palm Beach County, Florida.

164.    The S&J title commitment required a satisfaction of the Corvinia Mortgage as well. Instead of procuring a satisfaction, however, an assignment of mortgage from John George and Corvinia, LLC was executed on November 5, 2012, with an effective date of October 31, 2012, in favor of Congress 1010. The Assignment was recorded on December 26, 2013 at OR Bk/Pg 26525/1517 in the Public Records of Palm Beach County, Florida.

165.    David M. Goldstein prepared title in connection with the S&J Transaction. He knew of Congress Management's outstanding and unrecorded mortgage. As a member of Congress Plaza and as the attorney who handled Congress Plaza's foreclosure case against Congress Shopping Center, he knew about the Corvinia mortgage. Despite having personal knowledge of two outstanding mortgages against the parcels, David M. Goldstein took affirmative steps to close the transaction.

166.    Barry G. Roderman executed the satisfaction of the Jeff George Mortgage and did so through Congress 1010, which appears to exist for the sole purpose of buffering Congress Plaza. David M. Goldstein acted in his capacity as title agent to facilitate closing the S&J transaction. In these roles, Mr. Roderman and Mr. Goldstein each took affirmative and overt steps to conceal--and did actually conceal--the existence of Congress Management's mortgage, which they knew to be outstanding and unrecorded, in order to complete the sale of property to S&J.

167.    Barry G. Roderman, David M. Goldstein, and Suzanne Farese continued their plan to conceal Congress Management's mortgage when, in 2014, they sought to refinance the three parcels (ending in 0090, 0150, and 0160) still owned by Congress Plaza.

168.    This time, they did not even approach Congress Management with a request to satisfy its unrecorded mortgage. Because of the satisfaction by Congress 1010, the Jeff George Mortgage did not register so much as a blip in the title commitment, although the reason why remains unclear given that there remains a missing link in the ownership of that mortgage between Congress Management and Congress Plaza due to the unrecorded assignment.

169.    Instead, Suzanne Farese, as managing member of Congress Plaza, simply executed a title affidavit stating that she had no knowledge of any "judgments, mortgages, encumbrances, or liens of any nature affecting said property." **Composite/Exhibit 11-1.** This was a false statement, as Suzanne Farese had actual knowledge of Congress Management's mortgage. She signed not only the checks by which monthly payments were made on the mortgage, but also the requested modification in 2012. *See* **Composite/Exhibit 4-1** and **4-2.**

170.    Suzanne Farese's false title affidavit was consistent with the Title Commitment, which did not detect Congress Management's mortgage. Accordingly, title was issued and

Fennario presumably took a first priority lien against the property.

171.    Barry G. Roderman, David M. Goldstein, and Suzanne Farese acted in concert to affirmatively conceal the mortgage that was originally held by Congress Management before being subsequently assigned to Plaintiff. Their actions actually resulted in the concealment of Plaintiff's mortgage from subsequent purchasers and interest holders and caused Plaintiff to lose priority of his mortgage and limited his ability to bring an enforcement action when Congress Plaza defaulted on the debt that the Congress Management mortgage secured.

## **RESERVATION TO SEEK PUNITIVE DAMAGES**

172.    Plaintiff expressly reserves the right to seek punitive damages against Defendants upon a showing of evidence in the record or proffer to establish a reasonable basis to plead a claim for punitive damages pursuant to Fla. Stat. § 768.72(1).

## **NON-JURY TRIAL**

Defendants Congress Plaza and Thomas R. Farese waived the right to a jury trial pursuant to a Waiver clause in the Congress Management Mortgage (*See* **Composite/Exhibit 2-2,** pg. 4).

## **REQUEST FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment as follows:

a.    Award damages against defendant Congress Plaza and Thomas R. Farese as specified in Count I for injuries sustained as a result of the breach of contract;

b.    Foreclose Plaintiff's mortgage against the parcels ending in 0150, 0160, and 0090 as specified in Count II and direct defendant Congress Plaza,

and its individual members, to assume responsibility for any funds due and owing to Fennario Investments, LLC;

c.   Award damages in favor of Plaintiff and against defendants David M. Goldstein and Goldstein Law for injuries sustained as a result of the breach of fiduciary duty as specified in Count III;

d.   Award damages in favor of Plaintiffs and against defendants Congress Plaza, Congress 1010, Goldstein Law, David M. Goldstein, Barry G. Roderman, and Suzanne Farese for injuries sustained as a result of fraud and deceit in their actions surrounding the sale of property to S&J in 2012 and in obtaining a mortgage loan from Fennario Investments, LLC in 2014 as specified in Count IV;

e.   Award Damages in favor of Plaintiff and against defendants Congress Plaza, Congress 1010, Goldstein Law, David M. Goldstein, Barry G. Roderman, and Suzanne Farese for injuries sustained as a result of their civil conspiracy to commit fraud in connection with the sale of property to S&J in 2012 and in obtaining a mortgage loan from Fennario Investments, LLC in 2014 as specified in Count IV;

f.   Reserve Plaintiff's right to seek punitive damages against the appropriate defendants upon an appropriate showing in the record;

g.   Direct defendants to pay interest at the highest rate allowable by law on the amount of damages sustained by Plaintiff as a result of Defendants' culpable conduct;

h.   Award Plaintiff attorney's fees and costs as provided for in Paragraph 17

of the Settlement Agreement; and

i.      Granting such other relief as the Court may deem just and proper.

Respectfully Submitted on August 14, 2017.

BELTRANO & ASSOCIATES
Counsel for Plaintiff
4495 Military Trail, Ste. 107
Jupiter, FL 33458
Telephone: (561) 799-6577
Facsimile:  (561) 799-6241
E-mail: Service@beltranolaw.com


BY:    ____/s/Aldo Beltrano_____
        **Aldo Beltrano, Esq.**
        FBN 139300

## Certificate of Service

        I HEREBY CERTIFY that the foregoing was electronically filed with the Clerk of the Courts and served to counsel of record via the CM/ECF system on the 14th day of August, 2017.

BELTRANO & ASSOCIATES
Counsel for Plaintiffs
4495 Military Trail, Ste. 107
Jupiter, FL 33458
Telephone: (561) 799-6577
Facsimile:  (561) 799-6241
E-mail: Service@beltranolaw.com


BY:    ____/s/Aldo Beltrano_____
        **Aldo Beltrano, Esq.**
        FBN 139300
        aldo@beltranolaw.com